FILED
2015 Aug-24  AM 09:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN  DIVISION

| | |
|---|---|
| **CARLTON DUBOSE,** | ] |
| | ] |
| **Plaintiff,** | ] |
| | ] |
| **v.** | ] |
| | ]    **CV-15-BE-852-S** |
| **CITY OF HUEYTOWN, et. al.,** | ] |
| | ] |
| **Defendants.** | ] |
| | ] |
| | ] |

## MEMORANDUM OPINION

This § 1983 matter— asserting excessive use of force; unlawful search and seizure; failure to train, supervise, and discipline; and deliberate indifference to medical needs, among other claims—is before the court on "Defendants' Motion to Dismiss."  (Doc. 8).  The Plaintiff has responded to this motion (doc. 15) and the Defendants filed a reply (doc. 17); this motion has received thorough briefing.  For the reasons stated in this Memorandum Opinion, the court WILL GRANT the motion to dismiss to this extent: the court WILL DISMISS the complaint WITHOUT PREJUDICE to re-pleading in a manner consistent with Rule 8(a)(2) of the Federal Rules of Civil Procedure and the Eleventh Circuit's directive against shotgun pleadings.

## FACTS

The Complaint in this case contains fictitious parties designated as officers with letters of the alphabet, because the Plaintiff does not yet know the identity of the Hueytown Police Department officers who committed certain acts alleged and described in the Complaint.  The

court will discuss subsequently in this opinion the Eleventh Circuit law about fictitious party practice.

The Plaintiff, Carlton Dubose, has received on-going treatment for epileptic seizures since 2009.  Those seizures are controlled as long as he takes Dilantin prescription medication.

On March 4, 2014, Dubose was driving on a four-lane road when another vehicle swerved into his lane and caused Dubose's vehicle to slide off the road and into a ditch.  The driver of the other vehicle stopped momentarily but left the scene without providing Dubose with information about her identity or her insurance.  After Dubose called a wrecker service for assistance in getting his vehicle out of the ditch, Officer A[1] arrived on the scene and asked Dubose if he needed assistance.  Shortly afterwards, Officers B, C, and D arrived[2].

Officers A and B asked Dubose if he were intoxicated at the time of the accident, and, when Dubose responded "no," they performed a field sobriety test on him.  After passing the field sobriety test, Dubose attempted to walk down the steep incline into the ditch to retrieve items out of his car, including his Dilantin.  However, Officer C  yelled at Dubose to come out of the ditch, claiming that he could tell Dubose had been drinking, despite Dubose's passing of the field sobriety test and without Officer C's performing any further tests on him.  Officer C handcuffed Dubose, violently threw him against the police car, and then took him to the City of Hueytown Jail.  Despite Dubose's advising the officers before leaving the accident scene that his Dilantin

---

[1] The Complaint does not identify or describe Officer A except as the first officer on the scene.

[2] The Complaint identifies Officer B as a "Caucasian male"; Officer C as a "Caucasian male with blonde/gray hair and not tall in stature," who handcuffed him and who took him to the booking officer at the jail; and Officer D as "an African American male." (Doc. 1, at 4, ¶¶ 18, 19 & 20).

2

was in his car and that he must take it as prescribed to prevent seizures, the Officers ignored him.

Upon arrival at the jail, Officer C began the booking process with Officer E, described as the booking officer on duty, and Dubose immediately advised Officer E that he needed his prescription Dilantin to avoid seizures, and asked whether someone could bring to him his Dilatin from the car or call his primary care doctor to send his prescription to the jail.  Officer E responded that Dubose would be fine and that he could take his prescription when he got out of jail.

 Officer E began interrogating Dubose about his correct name, because two forms of identification on him had two different spellings of his last name.  When Dubose tried to explain that the driver's license contained the correct spelling, Officer E became enraged, called Dubose a "smartass" and physically struck Dubose hard on the head while Dubose sat in handcuffs.

Other unidentified officers rushed over to Dubose; asked him if everything was okay; took him to another area of the common room; forced him to change his clothes in front of everyone in the common room while the officers laughed; and gave him oversized XXL prison attire although he is a small man with a height of 5'5" and weighs approximately 140 pounds. Before he was taken to his cell, Dubose again pleaded with the officers that he needed his prescription Dilantin or that he would have seizures.  The officers told him to stop talking about "those pills" and said Dubose "could get them later."

Approximately four hours after his arrest, Dubose started having pre-seizure symptoms: his hand started trembling, and his eyes turned red and began twitching.  Dubose's cellmate, who had heard Dubose's plea for his prescription Dilantin,  asked him if he were okay, and began pleading along with Dubose for officers to help, and when the officers ignored the pleas, asked

them to call a nurse or the EMT.  The City of Hueytown Fire and Rescue is physically attached to

the jail, but no one at the jail asked EMT or other Fire and Rescue personnel to help Dubose at

this time.  When these requests were also ignored, Dubose told his cellmate that, when he started

seizing, to tell the EMT that Dilantin was his seizure medication.

 Dubose next climbed on the sink in his jail cell to be close to the video camera and began

waiving his hands in front of the video camera and yelling that he was about to have a seizure

and needed immediate medical help. Other inmates joined in, trying to get the officers' attention.

Within thirty minutes of the time Dubose began pleading in front of the camera, he began

foaming at the mouth, had a seizure on the floor of his cell, and hit his head while seizing.

After Dubose's seizures began, the officers called the paramedics to take him to the hospital, and

Dubose was transported via ambulance to UAB West.  Approximately ten hours elapsed from the

time Dubose arrived at the jail until he left in the ambulance.  UAB medical records reflect that

he had a large knot on his head and that he had suffered a seizure in custody.

After being released from the hospital, Dubose went back to Hueytown Jail,  where

officers told him that he did not need to pay a bond and that he was free to leave.

On May 5, 2015, Dubose filed the challenged complaint.  The eighteen-page pleading

contains seven counts: Count I – Excessive Use of Force; Count II – Fourth Amendment –

Unlawful Search and Seizure; Count III – Failure to Train, Supervise, and Discipline; Count IV –

Tort of Outrage; Count V – Assault and Battery; Count VI – False Imprisonment; and Count VII

– Deliberate Indifference to Medical Needs.  At the beginning of each count, the pleading

incorporates by reference all preceding paragraphs.  Each of the counts states that the claims in

that count are asserted against "Defendants."

4

## LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)). A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47). It does, however, "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009). Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations. *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

*Id*.  (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified "two working principles" for the district court to use in applying the facial plausibility standard.  The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.   The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.  Thus, under prong one, the court determines the factual allegations that are well-pleaded and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pleaded facts.  That task  is "context-specific" and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense. . . to infer more than the mere possibility of misconduct." Id.  If the court determines that well-pleaded facts, accepted as true, do not state a claim that is plausible, the court must dismiss the claim.  *Id.*

The court notes that the Plaintiff was incorrect when he asserted that "[t]he complaint should not be dismissed unless it appears that Plaintiff can prove <u>no</u> set of facts in support of his claim which would entitle him to relief."   (Resp. Br., Doc. 15 at 2-3) (quoting *Jenkins v. McKeithen,* 395 U.S. 411, 422 (1969) (emphasis added) which in turn quoted the language in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *abrogated by Twombly,* 550 U.S. at 546*;* also citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) & *Wright v. Newsome,* 795 F.2d 964, 967 (11th Cir. 1986) for similar reiterations of the "no set of facts" pleading standard).  As the United States Supreme Court subsequently explained and Defendants correctly point out, the "no

set of facts" pleading standard "has earned its retirement" and "is best forgotten...." *Twombly,* 550 U.S. at 546.  Because the Supreme Court clearly abrogated this standard in May of 2007, over eight years ago, Plaintiff's counsel have no excuse for quoting it as current law, and they need to delete it from future briefs or risk losing credibility in their legal arguments.

## DISCUSSION

### A.  Fictitious Parties

Fictitious party practice is generally not permitted in federal court.  *New Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n. 1 (11th Cir. 1997).  However, the Eleventh Circuit "created a limited exception to this rule when the plaintiff's description of the defendant is so specific as to [make the use of the fictitious name to] be 'at the very worst, surplusage.'" *Richardson v. Johnson,* 598 F.3d 734, 738 (11th Cir. 2010) (quoting *Dean v. Barber,* 951 F.2d 1210, 1215-16 n. 6 (11th Cir. 1992)).  When "the plaintiff is unwilling or unable to use the party's real name" but the pleading nevertheless "adequately describe[s] the person to be sued so that the person could be identified," the fictitious party is a proper initial defendant, particularly where the fictitious defendant was an employee of another defendant and the defendant employer is in the best position to identify the adequately described fictitious defendant through its records and/or personnel.  *See Dean,* 951 F.2d at 1216 & n. 6.

In the instant case, the complaint describes Officer A as the City of Hueytown police officer who arrived first on the scene of Dubose's accident, and Officer E as the booking officer when Dubose arrived at the Hueytown City jail, and the police and jail records should reflect their identities based on their descriptions.  The complaint described Officers B, C, and D as Hueytown City police officers who arrived on the scene of Dubose's accident after Officer A.  It

also listed their races and genders, and, because B and C were both male Caucasians, further

described C as "a Caucasian male with blonde/gray hair and not tall in stature" and also as the

officer who handcuffed Dubose.    (Doc. 1 ¶ 19).   Depending upon whether the police records

reflect the names of all officers at the accident scene and who handcuffed Dubose, and whether

both of the Caucasian officers at the scene fit the physical description of Officer C, the complaint

may well adequately identify officers B, C, and D.   At this point, based on the limited

information in front of the court, the court FINDS that the fictitious parties are adequately

described in the complaint and fall into the exception discussed above.  However, that ruling

does not mean that the complaint is not subject to dismissal on other grounds, and does not mean

that the court will not re-visit this ruling based on additional information if the Plaintiff re-

pleads.  Further, if the Plaintiff re-pleads, he must act promptly to ascertain the names and to

substitute named parties for the fictitious ones.

### B.  Shotgun Pleading

As noted previously in this opinion, each count of the challenged complaint incorporates

by reference all preceding paragraphs.  Further, each federal count states that it is asserted against

all "Defendants," and each state count states that it is asserted against all "Officer Defendants."

In the recent decision of *Weiland v. Palm Beach Cnty. Sheriff's Office,* 792 F.3d 1313

(11th Cir. 2015), the Eleventh Circuit Court of Appeals acknowledged its "thirty-year salvo of

criticism aimed at shotgun pleadings" and divided shotgun pleadings into four categories,

including three categories that apply here:  category one— "where each count adopts the

allegations of all preceding counts, causing each successive count to carry all that came before

and the last count to be a combination of the entire complaint"; category two—"being replete

with conclusory, vague, and immaterial facts"; and category four— "asserting multiple claims against multiple defendants without specifying which defendant(s) are responsible for which acts or omissions...."  The Court of Appeals explained that "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1321-22.

And, because defendants cannot be guilty of constitutional violations under § 1983 through *respondeat superior* based on the conduct of others, the identification of *which* defendant did *what* is critically important. *See Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*....a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 691, 693-94 (1978) (finding that a municipality cannot be held liable under § 1983 on a *respondeat superior* theory).

Further, where, as here, the individual defendants raise qualified immunity, the court cannot wait until after discovery in the summary judgment stage to fill in the holes of an ill-pleaded shotgun complaint.  Because qualified immunity represents "'an immunity from suit rather than a mere defense to liability,'" the Supreme Court of the United States  "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *See Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (quoting *Mitchell v. Forsyth,* 472 U.S. 411, 426 (1985)).  To follow that mandate, the court—as well as the Defendants—needs to know the Plaintiffs' allegations as to who did what.

9

The complaint in the instant case represents a shotgun pleading that falls into categories one, two, and four described above, with each count incorporating by reference the allegations of all preceding counts and asserting claims that are often vague and conclusory against all or virtually all Defendants.  That combination causes the Defendants and this court to speculate about which facts support which claims in which counts, and to attempt to decipher why all Defendants (or, in the case of the state law claims, all Officer Defendants) are guilty of the claims when the paragraphs under each count do not specifically say so.

For example,  Count I,  asserting excessive force, incorporates by reference all preceding 39 paragraphs, leaving the court and the Defendants unsure which facts support the claim and which Defendants did what.  If the court ignores the paragraphs incorporated by reference, the only facts under Count I supporting excessive force *and identifying the officer who committed them* are those in ¶ 42,  identifying Defendant Officer E as the officer who physically struck the Plaintiff in the head while the Plaintiff sat in handcuffs.  Yet, Paragraph 41 draws a broader group of Defendants into the excessive force activity; it says that all "Defendant Officers handcuffed the Plaintiff and then violently threw the Plaintiff against the police car," indicating that perhaps all the Defendant Officers—Hickey, Campbell, and fictitious Defendant Officers A-E—collectively and in concert handcuffed him and threw him against the car at the accident scene.  This allegation is confusing in light of the information in ¶ 24 in the fact section of the complaint, incorporated by reference into Count I, which states that only Defendant Officer C threw him against the car.  Finally, Count I indicates that the Plaintiff asserts excessive force allegations against all "Defendants," presumably including Chief Hagler and the City, but it has not alleged facts about Hagler's misconduct nor has it alleged facts, such as those plausibly

supporting an official city policy or custom, which would be required for municipal liability under § 1983. *See Weiland,* 792 F.3d at 1328 (citing *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)).

After reading *Count I,* the court, and, presumably, the Defendants, would have difficulty analyzing the claim to determine which Defendant allegedly did what act(s) that supposedly constitute excessive force.  This problem means that each Defendant does not have adequate notice of which claims he or it must defend and the grounds for that claim. And, if the court does *not* ignore the facts incorporated by reference, it must figure out which facts in the preceding 39 paragraphs supposedly support the claim.  Head-scratching about holes left by the shotgun— which facts support which claim against which Defendant— should not be the job of the court: the complaint should clearly and plausibly say so.  This one does not.

The other counts of the complaint suffer from similar holes as a result of shotgun pleading.  If the court ignores the 44 paragraphs incorporated by reference into *Count II*, that claim states conclusorily without specifying the supporting facts that all Defendant Officers collectively and in concert conducted an unlawful and unwarranted search and/or seizure of the Plaintiff on March 4, 2014.  However, if the court does *not* ignore the facts incorporated by reference, confusion reigns because the fact section of the complaint reflects that only Defendant Officers A-D were on the scene of the arrest.  And, once again, the Plaintiff asserts this claim against all "Defendants" but provides no facts about Chief Hagler and no facts of an official policy or custom to support municipal liabililty.

*Count III* incorporates by reference the preceding 48 paragraphs and states conclusorily that all Defendants failed to train, supervise and discipline Defendant Officers in particular areas

11

without providing *facts* supporting municipal liability; without providing *facts* reflecting which Defendant trained, supervised, or was responsible for disciplining whom; and, critically important, without providing *facts* supporting a pattern of similar constitutional violations or otherwise reflecting that each Defendant was on notice *prior to* this incident, of the need to train, supervise or discipline in a particular area. *See Weiland,* 792 F.3d at 1328-29 n. 20 (citing *Gold v. City of Miami,* 151 F.3d 1346, 1351 (11th Cir. 1998); *Wright v. Sheppard,* 919 F.2d 665, 674 (11th Cir. 1990); and *Brooks v. Scheib,* 813 F.2d 1191, 1192 (11th Cir. 1987)).   The court recognizes that allegations of "previous incidents is not required to establish city policy if the need to train and supervise in a particular area is 'so obvious' that liability attaches for a single incident." *Weiland,* 792 F.3d at 1329 (quoting *Gold,* 151 F.3d at 1352).  However, the complaint does not allege that the need for specialized training  on the applicable areas of use of excessive force, search and seizure, arrest procedures, and medical needs of inmates is "'so obvious' that the failure to provide such training amounts to deliberate indifference." *See id.*

In the state court counts, *Counts IV, V, and VI,* each incorporates by reference all preceding counts and each primarily focuses on one officer's conduct but nevertheless asserts the claims against all Defendant Officers.  The shotgun holes and the vague, conclusory language leave unclear which other officers committed which acts, who was actually present when certain acts occurred and who had notice of them, and which facts support claims against which Defendant.

The final claim in *Count VII*, asserting deliberate indifference to medical needs, incorporates by reference the preceding 75 paragraphs; claims conclusorily without providing supporting *facts* that "Defendant City of Hueytown, Defendant Chief of Policy Chuck Hagler,

12

and others have created an atmosphere of tolerance regarding willful ... behavior of its officers that has resulted in a reputation of indifference to the medical needs of citizens while being detained in Defendant City's Jail"; and further claims that all Defendants have engaged "in a pattern or practice of systemic deficiencies," including failing to provide training, investigation, and discipline regarding officers' improper conduct in disregarding of inmates' medical needs. Although these allegations at least attempt to assert the existence of a policy or custom that would support municipal liability, to effectively allege a claim against the City, the Plaintiff needs to add *facts* supporting these conclusions *other than* the alleged facts about what happened to this Plaintiff on one occasion in March of 2014; one incident does not a custom or policy make.

As to the claims for deliberate indifference against the Chief and individual officers, the court again should not have to fill in the shotgun pleading holes to figure out which of the preceding paragraphs apply to support the claims against each of the Defendants.  If the Plaintiff is asserting this claim against all of them, he must specify which Defendant did what, who was present when, and which facts support liability against each.

In sum, the Plaintiff has failed to acknowledge and to follow Eleventh Circuit directives on proper pleadings.  Because the directive disfavoring shotgun pleadings has been around thirty years, he is without excuse, and his Winchester has backfired.  The court will dismiss the complaint without prejudice and will provide the Plaintiff with an opportunity to hang up the shotgun and obey the law peaceably, re-pleading in a manner consistent with Rule 8(a)(2) of the Federal Rules of Civil Procedure and Eleventh Circuit caselaw.  If the Plaintiff ignores this warning, the court will consider dismissing with prejudice the next pleading, or some of its

13

claims against some of the Defendants, pursuant to Rule 41(b).

Dated this twenty-fourth day of August, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE