# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN  DIVISION

CARLTON DUBOSE,                    ]
                                   ]
    Plaintiff,                 ]
                                   ]
v.                                 ]
                                   ]        **CV-15-BE-852-S**
CITY OF HUEYTOWN, et. al.,         ]
                                   ]
    Defendants.                ]
                                   ]
                                   ]

## <u>MEMORANDUM OPINION</u>

The complaint in this case asserts various federal and state claims against the City of Hueytown, its police chief and various officers for excessive force, unlawful search and seizure, and deliberate indifference to medical needs, among others.  It comes before the court on "Defendants' Motion to Dismiss Amended Complaint"  (doc. 25).  The Plaintiffs filed a responsive brief (doc. 27), and the Defendants replied (doc. 28); this motion has received thorough briefing.

For the reasons stated in this Memorandum Opinion, the court FINDS that the motion is due to be GRANTED IN PART and DENIED IN PART as set out in detail in this document. More specifically, the motion WILL BE GRANTED as to *all* claims asserted against the City of Hueytown and Chief Chuck Hagler; those claims WILL BE DISMISSED WITH PREJUDICE, and those two Defendants WILL BE DISMISSED as parties.  As to claims asserted against Corporal Jarrod Campbell and Officer James Hickey, the motion WILL BE GRANTED IN PART and DENIED IN PART, as further set out below.  The court will also dismiss *sua sponte*

1

certain claims asserted against Fictitious Officer Defendants, as further set out below.

## I.  PROCEDURAL BACKGROUND

This motion is the second motion to dismiss filed in this case.  The court previously granted in part and denied in part  (Memo. Op. Doc. 20, Order Doc. 21) Defendants' motion to dismiss (doc. 8) the original Complaint (doc. 1), dismissing the first Complaint without prejudice to re-pleading in a manner consistent with Rule 8(a)(2) of the Federal Rules of Civil Procedure and the Eleventh Circuit's directive against shotgun pleadings.  In its Memorandum Opinion on the first motion to dismiss, the court noted the existence of fictitious parties in the original Complaint and also noted that, while fictitious party practice is generally not permitted in federal court, the Eleventh Circuit has created a "limited exception to this rule" when the plaintiff provides a specific description of the unnamed defendant so that the person could be identified. *See Dean v. Barber,* 951 F.2d 1210, 1215-16 n. 6 (11th Cir. 1992).  The use of fictitious parties until discovery provides the correct name of the defendant makes sense particularly where, as here, the fictitious party defendant was an employee of another defendant, and the defendant employer is in the best position to identify the adequately described fictitious defendant through its records and/or personnel.  *See id.*  This court found that the original Complaint adequately described the fictitious parties and that they fell into the limited exception discussed above. (Doc. 20, at 8).

This court previously had granted the Plaintiff leave to file an Amended Complaint on or before September 11, 2015, and the Plaintiff timely filed the Amended Complaint (doc. 24) made the basis of the instant motion.  That Amended Complaint contains the following claims: Count I - Excessive Use of Force in violation of the Fourth & Fourteenth Amendments of the United States Constitution, the Alabama State Constitution, and unspecified federal and state statutory

laws, asserted against Fictitious Defendants A and E; Count II - Fourth Amendment Unlawful Search & Seizure asserted against Fictitious Defendants A, B, C, and D; Count III - Failure to Train, Supervise & Discipline against the City of Hueytown & Defendant Chief of Police Hagler; Count IV - Tort of Outrage, brought under Alabama common law and asserted against Fictitious Defendants A-J, as well as against Defendants Hagler, Campbell, and Hickey; Count V - Assault & Battery brought against Fictitious Defendants A-E, brought under Alabama law; Count VI - False Imprisonment brought under Alabama law and asserted against Fictitious Defendants A-J; and Count VII - Deliberate Indifference to Medical Needs brought as a violation of the privileges and immunities clauses protected by the United States and Alabama Constitutions, and asserted against the City of Hueytown, Chief Hagler, and Fictitious Defendants A-J. Plaintiff requests equitable relief, compensatory and punitive damages, costs, and attorney fees.

## II.  LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint. Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)).  A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47).   It does, however, "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009).   Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations.

3

*Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570). To be plausible on its face, the claim must contain enough facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified "two working principles" for the district court to use in applying the facial plausibility standard. The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The second principle is that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679. Thus, under prong one, the court determines the factual allegations that are well-pleaded and assumes their veracity, and then proceeds, under prong two, to determine the claim's plausibility given the well-pleaded facts. That task is "context-specific" and, to survive the motion, the allegations must permit the court based on its "judicial experience and common sense. . . to infer more than the mere possibility of misconduct." Id. If the court determines that well-pleaded facts, accepted

4

as true, do not state a claim that is plausible, the court must dismiss the claim.  *Id.*

## IV.  FACTS

The court takes the following alleged facts as true for the purposes of this motion to dismiss.

The Plaintiff, Carlton Dubose, has received on-going treatment for epileptic seizures since 2009.  Those seizures are controlled as long as he takes Dilantin prescription medication.

On March 4, 2014, Dubose was driving on a four-lane road with Dilantin pills in the car when another vehicle swerved into his lane and caused Dubose's vehicle to slide off the road and into a ditch.  The driver of the other vehicle stopped momentarily, but left the scene without providing Dubose with information about her identity or her insurance.  Dubose was not injured at this time, and he called a wrecker service for assistance in getting his vehicle out of the ditch.

Shortly thereafter, Officer A arrived on the scene and asked Dubose if he needed assistance, and  Officers B, C, and D arrived subsequently. Officers asked Dubose if he was intoxicated, and when he denied intoxication, they performed a field sobriety test, confirming his sobriety.  The officers did not perform a breathalyzer test.  In the meantime, Officers C and D began searching inside Dubose's car, including looking into the medical bag that contained his seizure medication. Informing the officers about his grand mal seizure condition and the need for his Dilantin medication still in his car, Dubose attempted to go down into the ditch to retrieve the Dilantin.  However, Officer A prevented the retrieval, handcuffing him and throwing him against the police car with the assistance of Officers B and D and in the presence of Officer C.

Despite Dubose's continued protests about needing his medication, the officers took him to the Hueytown jail without retrieving his medication or allowing him to retrieve it.  Once at the jail, Dubose immediately informed the booking officer, Officer E, about his seizure condition

5

and the need for Dilantin.  However, Officer E ignored that information and began a discussion with Dubose about inconsistencies between the spelling of his last name on his two forms of identification.  Allegedly without provocation, Officer E became enraged at Dubose, physically striking Dubose in the head as Dubose sat in handcuffs, and continuing to stand over him, threatening him.  Other unknown officers[1] rushed over to Dubose and asked if everything was "ok." (Doc. 24, at 7, ¶ 30).

After Dubose was struck in the head, Officers F, G, H, and I led him to another area of the common room of the Jail, where they forced him to take off his clothes in front of everyone in the room and dress in oversized prison attire, while the officers laughed at him.  When Dubose continued to plead with those officers about his need for seizure medication, asking that someone obtain his Dilantin from his car or obtain a prescription for him, Officer F told him to stop talking about "those pills," stating that Dubose "could get them later."  (Doc. 24, at 7, ¶ 31).

Approximately four hours after his arrest, Dubose was in a jail cell and started having pre-seizure symptoms:  his hand started trembling, and his eyes turned red and began twitching. Dubose's cellmate, who had heard Dubose's plea for his prescription Dilantin,  asked him if he was okay, and began pleading along with Dubose for officers to help.  When Officer G came to the cell, Dubose renewed his pleas for seizure medicine.  When Officer G ignored his request, Dubose asked that he be able to see a nurse or that an EMT be called, but these requests were also ignored.  Dubose asked his cellmate, in the event that he started seizing, to tell the EMT that

---

[1] Because the amended complaint does not give these unknown officers a letter, the court must assume that they are not among the Fictitious Defendant Officers sued.  Obviously, these unknown officers were witnesses to Officer's E's striking of Dubose.  However, the Amended Complaint does not specifically say that any of the Fictitious Defendant Officers witnessed Officer E's striking of Dubose.

Dilantin was his seizure medication

Dubose next climbed on the sink in his jail cell to be close to the video camera and began waiving his hands in front of the video camera and yelling that he was about to have a seizure and needed immediate medical help. Other inmates joined in, yelling for Officers F, G, H, I, and J to help.  Within thirty minutes of the time Dubose began pleading in front of the camera, he began foaming at the mouth, had a seizure on the floor of his cell, and hit his head during the seizure.  After Dubose's seizures began, the officers called the paramedics for the first time, and paramedics took him to UAB West via ambulance.   UAB West Hospital records reflect that Dubose had a large knot on his head and that he had suffered a seizure in custody.

After being released from the hospital, Dubose returned to the Hueytown Jail, where officers told him that he did not need to pay a bond and that he was free to leave.

## V.  DISCUSSION

### A.  Preliminary Matters

Several preliminary rulings apply to multiple Defendants, including the Named Defendants filing the instant motions.  The court addresses these matters at the beginning to define and refine which claims merit discussion.

### 1.  *Abandonment of State Law Claims*

The court acknowledges the Defendants' argument that Dubose abandoned his state law claims in his response to Defendants' motion to dismiss the original Complaint.  The court rejects the abandonment argument to the extent that it is based on what Dubose argued or failed to argue in the briefing on the motion to dismiss the *original* Complaint; such a basis is irrelevant to the current motion.  The court dismissed the state law claims in the original Complaint without prejudice.  The current motion addresses the *Amended* Complaint, which again presents state law

claims, as Dubose had a right to do.  In his responsive brief addressing the motion to dismiss the

Amended Complaint, Dubose addressed the challenge to the state law claims of tort of outrage,

assault and battery, and false imprisonment, so he has not abandoned those state law claims.

To the extent that Dubose attempted to assert any *other* claims under the Alabama

Constitution or under Alabama law, however, the court FINDS that he has abandoned them. The

court notes that Count I purports to bring a claim for Excessive Force in violation not only of the

Fourth and Fourteenth Amendments of the United States Constitution, but also of unspecified

provisions of the Alabama State Constitution, and unspecified "statutory laws in the United

States and Alabama."  (Amend. Compl. Doc. 24,  ¶ 42.).  Similarly, Count VII purports to bring a

claim for deliberate indifference to medical needs in violation of rights, privileges and

immunities protected not only by the U.S. Constitution and unspecified laws of the United States,

but also by unspecified provisions of the Alabama Constitution.  (*Id.* at ¶ 70).

In his responsive brief addressing the motion to dismiss the Amended Complaint, Dubose

did not address *state* law claims based on excessive force and deliberate indifference in violation

of the *Alabama* Constitution.  Dubose discussed Constitutional violations in the context of

qualified immunity, which is an immunity that applies only to federal claims; however, he neither

discussed nor cited any provisions of the Alabama Constitution nor did he cite any Alabama state

law, whether statutory or decisional law, regarding excessive force or deliberate indifference.  As

a final note, in the state law section of his brief, as noted above, Dubose listed and discussed

three state law claims—tort of outrage, assault and battery, and false imprisonment—and in the

last discussion regarding false imprisonment, Dubose characterized it as the "last state law

claim."  Thus, to the extent, if any, that Dubose may have originally intended to assert any state

law claims in addition to the three listed, he has abandoned them, and they are due to be

8

DISMISSED.  *See Coal. for the Abolition of Marijuana Prohibition v. Atlanta,* 219 F.3d 1301, 1326 (11th Cir. 2000) (stating that the appellants' "failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned); *Prickett v. BAC Home Loans,* 946 F. Supp. 2d 1236, 1242 (N.D. Ala. 2013) (finding the wrongful foreclosure claim abandoned because plaintiffs offered no response to the motion to dismiss as to that claim).  As this round of motions is the second set, and this pleading is Dubose's second, that dismissal will be WITH PREJUDICE.

As an *alternative* ruling, the court FINDS that, to the extent Dubose intended to assert any claims under Alabama law *in addition to* the tort of outrage, assault and battery, and false imprisonment, he has failed to sufficiently identify which Alabama laws he has invoked, and has otherwise failed to state a plausible claim on such theories sufficient to meet the pleading standards to withstand a motion brought pursuant to Rule 12(b)(6).

### 2.  Abandonment of Certain Federal Claims in Counts I and VII

In Counts I and VII, Dubose makes vague allegations about the violation of federal laws without identifying those federal laws.  In Count I, entitled "excessive use of force," he first identified the Fourth and Fourteenth Amendments of the United States as the source of some of his federally protected rights.  However, he proceeded to claim that Defendants' use of excessive force also violated "statutory laws in the United States" without identifying those statutory laws except referencing 42 U.S.C. § 1983 in the jurisdictional section of the Amended Complaint[2].  In

---

[2]  Section 1983 itself does not create or establish any federally protected substantive rights; rather, it creates a federal cause of action to enforce federal rights created elsewhere, such as rights in other federal statutes or in the federal Constitution.  *See Chapman v. Houston Welfare Rights. Org.,* 441 U.S. 600, 608 (1979).  Accordingly, a precise allegation would not refer to a violation of § 1983 but would invoke § 1983 to remedy the alleged violation of some other federal or constitutional law by a person acting under color of state law.

9

his responsive brief, Dubose did not assert that Defendants' conduct violated any statutory laws of the United States.

Accordingly, the court FINDS that the claim in Count I asserting that Defendants' use of excessive force violated federal *statutory* law is ABANDONED and due to be DISMISSED, except to the extent that it refers to § 1983 as a remedy to enforce alleged violations of federal Constitutional law.  As this round of motions is the second set, and this pleading is Dubose's second, that dismissal will be WITH PREJUDICE.  As an *alternative* ruling, to the extent that Dubose asserted any claim that Defendants' use of excessive force violated federal *statutory law*, the court FINDS that he has failed to identify sufficiently what statutory law he invoked other than § 1983, and has otherwise failed to state a plausible claim on such a theory sufficient to withstand a motion brought pursuant to Rule 12(b)(6).

In Count VII, entitled "deliberate indifference to medical needs," Dubose asserted that "Defendants are engaging in a pattern or practice of systemic deficiencies that has resulted in a widespread history of denial of basic medical treatment and providing of medications by Hueytown Police Officers depriving persons of rights, privileges and immunities secured or protected by the U.S. Constitution [and] the laws of the United States. . . ." (Amend. Compl. Doc. 24, at ¶ 70). Count VII does not specifically identify which "laws of the United States" he referenced, other than the United States Constitution.  Similarly, in his responsive brief, Dubose did not argue that Defendants violated any federal law *except* the United States Constitution. Accordingly, the court must conclude that the phrase "the laws of the United States" is either a reference to § 1983,  a redundant reference to the United States Constitution, or is a claim under different federal laws that Dubose has now abandoned.  The court FINDS that, to the extent, if any, that Dubose asserted a claim in Count VII for violation of any federal laws *except* the United

States Constitution, he has ABANDONED that claim, and that claim is due to be DISMISSED.

As this round of motions is the second set, and this pleading is Dubose's second, that dismissal

will be WITH PREJUDICE.

As an *alternative* ruling, the court FINDS that, to the extent Dubose intended to assert a

claims in Count VII for violation of any federal laws except the United States Constitution, he

has failed to identify sufficiently what federal law(s) were violated, and has otherwise failed to

state a plausible claim on such theories sufficient to meet the pleading standards to withstand a

motion brought pursuant to Rule 12(b)(6).

### 3. *Official Capacity Claims Asserted against All Individual Defendants*

Dubose sued Chief Hagler, Officer Hickey, Corporal Campbell, and Fictitious Officers A-

J in their official capacity as officers of the City of Hueytown.  The court notes that Dubose also

sued the City of Hueytown.  The Eleventh Circuit Court of Appeals has explained that such

official capacity claims are redundant: "When an officer is sued under Section 1983 in his or her

official capacity, the suit is simply another way of pleading an action against an entity of which

an officer is an agent .... Such suits against municipal officers are therefore, in actuality, suits

directly against the city that the officer represents." *Busby v. Orlando,* 931 F.2d 764, 776 (11th

Cir. 1991) (footnote, citations, and internal marks omitted).

In light of the redundancy, courts in the Eleventh Circuit routinely dismiss the official

capacity claims against the individual defendant when the municipality they represent is also a

defendant.  *See, e.g., Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs,* 405 F.3d 1298, 1302 n.

3 (11th Cir. 2005) (explaining that when a suit names as defendants both the county and county

fire marshal in his official capacity, only the county was the proper party); *Busby,* 931 F.2d at

776 & 782 (affirming the granting of directed verdict in favor of the municipal officers named in

11

their official capacity when the city was also a defendant, stating that keeping the official capacity claims was "redundant and possibly confusing to the jury").

In his responsive brief, Dubose acknowledged that official capacity claims against City officials are interchangeable with claims against the City itself, but explained that he listed both "to perfect service and guarantee due process." (Resp. Br. Doc. 27, at 14).

Consistent with the Eleventh Circuit's direction, this court WILL GRANT the motion to dismiss as to the official capacity claims asserted against Chief Hagler, Officer Hickey and Corporal Campbell; it WILL DISMISS those claims WITH PREJUDICE as redundant of those asserted against the City of Hueytown. Similarly, the court *sua sponte* WILL DISMISS WITH PREJUDICE the official capacity claims asserted against Fictitious Officers A-J.

**B. Remaining Claims Asserted Against the City and Named Individual Defendants**

### 1. *Individually Named Defendants*

All of the individually Named Defendants—Chief of Police Chuck Hagler, Officer James Hickey and Corporal Jarrod Campbell—raise their entitlement to qualified immunity as to the § 1983 federal claims asserted in Count I (Excessive Use of Force in violation of rights under the Fourth and Fourteenth Amendments to the United States Constitution), Count II (Unlawful Search and Seizure in violation of rights under the Fourth Amendment to the United States Constitution), and Count III (Failure to Train, Supervise, and Discipline in violation of rights protected by the United States Constitution), and Count VII (Deliberate Indifference to Medical Needs in violation of the rights protected by the United States Constitution). These Defendants also assert that the state claims are due to be dismissed.

Qualified Immunity Standard

The doctrine of qualified immunity provides that a government official acting within his

12

discretionary authority is immune from suit unless his conduct "violates clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Keating v. Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (quoting *GJR Invs., Inc. v. Cty. of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998), *overruled on other grounds,* as recognized in *Randall v. Scott,* 610 F.3d 701, 709 (11 th Cir. 2010) (alteration in original)).  To establish his entitlement to qualified immunity, the "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. . . . Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Penley ex. rel. Estate of Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. May 3, 2010) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)).

To determine whether the plaintiff meets his burden to establish that  qualified immunity is not appropriate, the Supreme Court has established a two-part test and has granted the district court discretion about the order in which it addresses each part. *Pearson v. Callahan*, 555 U.S. 223, 232 & 236 (2009).  One part of the test is "whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The second part of the test is whether the constitutional violation was clearly established at the time of the alleged wrongful conduct. *Saucier*, 533 U.S. at 201.  The officer is entitled to qualified immunity unless the plaintiff establishes both parts of the test.

The two parts of the test are designed to provide an over-arching concept of fair warning: "The salient question is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged conduct was unconstitutional." *Salvato v. Miley,*

13

790 F.3d 1286, 1292 (11th Cir. 2015) (quoting *Tolan v. Cotton,* ___ U.S. ___, ____, 134 S. Ct.

1861, 1866 (2014)). "We do not require a case directly on point, but an existing precedent must

have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd,* 563

U.S. 731, 741 (2011). Put another way, "[a] Government official's conduct violates clearly

established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are]

sufficiently clear' that every 'reasonable official would have understood that what he is doing

violates that right.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The

doctrine of qualified immunity "gives government officials breathing room to make reasonable

but mistaken judgments." *Ashcroft,* 563 U.S. at 743.

### a. Chief of Police Hagler

### (1). § 1983 Claims

The only federal claims that refer to Chief Hagler are the claims in Count III–failure to

train, supervise, and discipline and the those in Count VII–deliberate indifference to medical

needs.

### Count III- Failure to Train, Supervise, and Discipline

In Count III of the Amended Complaint, Dubose alleges that Chief Hagler failed to

adequately train, supervise, and discipline Hueytown officers in the following areas: use of force,

search and seizure, and medical treatment and medical procedures regarding people booked at the

Hueytown Jail. The Amended Complaint asserts that the rights violated are the Fourth and

Fourteenth Amendments to the Constitution of the United States. Chief Hagler raises qualified

immunity to this claim. The court FINDS that Chief Hagler was acting within the scope of his

discretionary authority when these allegedly wrongful acts occurred; accordingly, Chief Hagler is

entitled to qualified immunity unless Dubose sufficiently alleges facts that, if true, establish both

parts of the qualified immunity test.

As a preliminary matter, the court recognizes that while the failure to train, supervise, and discipline can be separate claims, the same standard for liability applies, so the court will address them together.  *See Gold v. Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998) (addressing claims for "failure to train or supervise"); *Shehada v. Tavss,* 965 F. Supp. 2d 1358, 1375 (S.D. Fla. 2013) (addressing claims of failure to train, investigate, or discipline).

As to the use of force, Dubose alleges two incidents of "excessive force" happened to him on the same day of March 4, 2014 involving multiple officers:  (1) Officer A handcuffing Dubose and violently throwing him against the police car with the assistance of Officers B and D; and (2) Officer E hitting him on the head without provocation while Dubose sat in handcuffs at the Hueytown jail.  He contends that this allegation states a claim that Hagler had failed to train, supervise and disciple his officers regarding the lawful use of force.  Dubose's Amended Complaint contains no allegations of incidents of excessive force *prior to March 4, 2014* that notified Hagler of the need for training, supervision, or discipline in this area.   Rather, Dubose merely assumes that because incidents excessive force occurred on a single day involving multiple officers, then a lack of training, supervision, and discipline must have also occurred.

 If the court were to accept this argument, then anytime an incident of excessive force exists involving multiple officers, the mere fact that it occurred would always support a claim for failure to train, supervise, and discipline.  However, the Supreme Court has instructed that "adequately trained officers occasionally make mistakes" and "the fact that they do says little about the training program ...." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)*.*  Indeed, Dubose cites no cases that in fact *support* his argument.

In the only case Dubose cites,  *Messerschmidt v. Millender,* ___ U.S. ___, 132 S. Ct.

1235 (2012), provides no meaningful support.  In *Messerschmidt,* the Supreme Court reversed

the denial of qualified immunity at the summary judgment stage regarding a claim that the search

warrant was unconstitutionally overbroad and that the search was unreasonable in violation of the

Fourth Amendment.  The case did not involve allegations of excessive force; did not address any

claim based on a theory of failure to train, supervise, and discipline; and does not validate

Dubose's argument here.

   Perhaps Dubose cites no supporting cases because the opinions of the United States

Supreme Court and Eleventh Circuit do *not* support Dubose's argument that the unconstitutional

acts of multiple officers on one date necessarily implicates their supervisor's failure to train or

supervise or discipline; that argument is, in effect, calling for the imposition of *de facto*

*respondeat superior* or vicarious liability, theories of liability that the Supreme Court and the

Eleventh Circuit have repeatedly refused to impose under section 1983.  *See Iqbal,* 556 U.S. at

677 ("In a § 1983 suit ...— where masters do not answer for the torts of their servants—the term

'supervisory liability' is a misnomer"); *City of Canton*, 489 U.S. at 391 (explaining that letting

the existence of a random deficiency or officer shortcoming support a failure to train claim would

mean imposing "*de facto respondeat superior*" liability on the municipality and municipal

supervisors, a liability that the Court has repeatedly rejected).

   Such a liability would "engage the federal courts in an endless exercise of second-

guessing municipal employee-training programs," which is an exercise "the federal courts are ill

suited to undertake" and which "would implicate serious questions of federalism."  *City of*

*Canton,* 489 U.S. at 392.  Absent vicarious liability, each Government officer, his or her title

notwithstanding, is only liable for his or her own misconduct."); *Keating* 598 F.3d at 762 ( "It is

well established that § 1983 claims may not be brought against supervisory officials on the basis

16

of vicarious liability or respondeat superior.").  Rather, a supervisor is only liable for his

subordinates' acts when he personally participates in them or where a causal connection exists

between his own actions and the constitutional violation. *Id.*

In *Doe v. School Bd. of Broward Cnty, Fla.,* 604 F.3d 1248 (11th Cir. 2010), the Court of

Appeals discussed again how a plaintiff may show a causal connection between the supervisor's

action and the alleged constitutional violation:

> The requisite causal connection can be established in the following circumstances:
> (1) when a "history of widespread abuse puts the responsible supervisor on notice of
> the need to correct the alleged deprivation, and he fails to do so" or (2) when a
> supervisor's "improper custom or policy results in deliberate indifference to
> constitutional rights."

*Id.* at 1266 (quoting *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir. 1999)).  "The

deprivations that constitute widespread abuse sufficient to notify the supervising official must be

obvious, flagrant, rampant, and of continued duration rather than isolated occurrences."  *Hartley,*

193 F.3d at 1269.

In the instant case, Dubose did not allege facts that Hagler participated in any of the acts

of excessive force against him or the improper searches and seizures of him or his property.  He

did not allege that Hagler directed the other officers to act unlawfully nor did he allege any facts

supporting Hagler's knowledge that they would act unlawfully, yet Hagler failed to act.  Dubose

did not allege that Hagler knew of *prior* incidents of improper use of force or searches and

seizures involving these officers, or indeed, any of the Hueytown police officers, and Hagler

failed to act.  Dubose does not allege that Hagler was on the scene at the time of any of the

March 4, 2014 incidents, in a position to stop those incidents, and yet failed to do so.  Finally,

Dubose does not allege that Chief Hagler himself established an improper custom or policy that

resulted in deliberate indifference to Dubose's constitutional rights.

17

In sum, Dubose's Amended Complaint fails to allege that Chief Hagler's *own* conduct violated federal constitutional or statutory law as to the use of excessive force or improper searches and seizures. Accordingly, Dubose's allegations fail to establish the first part of the qualified immunity test, and he fails to meet his burden to establish that the Chief is not immune; the court FINDS that Chief Hagler is entitled to qualified immunity as to the federal claims asserted against him in his *individual* capacity based on the failure to train, supervise, and/or discipline regarding use of force and searches and seizures.

> Counts III & VII: Failure to Train, Supervise, Investigate & Discipline in the Area of Medical Treatment/Medical Procedure/Deliberate Indifference to Medical Needs

The remaining claim asserted against Chief Hagler in Count III is the failure to train, supervise, investigate and discipline Hueytown Officers in the area of medical treatment and medical procedure. This claim appears in many respects to be duplicative of the claim against Hagler in Count VII, entitled "Deliberate Indifference to Medical Needs." Accordingly, the court will combine the discussion of the claims against Hagler asserted in Counts III and VII.

Dubose's rights to medical treatment as a pretrial detainee arise from the Fourteenth Amendment Due Process Clause. The Eleventh Circuit has explained:

> Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). Correctional officers are, of course, bound by the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* Technically, the Fourteenth Amendment Due Process Clause, not the Eighth Amendment prohibition on cruel and unusual punishment, governs pretrial detainees like [Plaintiff]. *Snow ex. rel. Snow v. City of Citronelle, Ala.,* 420 F.3d 1262, 1268 (11th Cir. 2005). However, the standards under the Fourteenth Amendment are identical to those under the Eighth. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.,* 402 F.3d 1092, 1115 (11th Cir. 2005).

*Goebert v. Lee Cty.,* 510 F.3d 1312, 1326 (11th Cir. 2007) (parallel citations omitted and

bracketed alterations added).  To prevail on such a claim, a plaintiff must show: "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann v. Taser Intern., Inc.,* 588 F.3d 1291, 1306 (11th Cir. 2009).  And, as previously discussed, when the claim is a failure to train or supervise or discipline, a plaintiff must establish a causal connection between the supervisor's own action and the alleged constitutional violation.  *Doe,* 604 F.3d at 1266.

In Count III, Dubose apparently attempts to assert a causal connection between Chief Hagler's own conduct and the alleged constitutional violation by alleging that Chief Hagler knew of the problem in this area yet failed to act.  Dubose alleges that "over the past five years, the City of Hueytown and the Defendant Chief have been put on notice about the severity of depriving patients of necessary medication, even having been named in a suit for failing to allow a different inmate access to his seizure medication in one such instance."  (Doc. 24, ¶ 24(f), at 13).  The allegation does not state the parties or date of the other suit, the date of the incident made the basis of the other suit,[3] or provide any further details.

The court notes that this allegation in Count III does *not* state that the Chief had notice of a need to train, supervise, and/or discipline Hueytown officers because of past *unconstitutional* conduct involving the unlawful deprivation of seizure medication by Hueytown Officers. The

---

[3] The only time frame given for this other incident of seizure medication deprivation was a statement in the Amended Complaint indicating that a lawsuit had been filed against Chief Hagler and the City based on this other incident sometime "over the past five years." (Amend. Compl. Doc. 24, at 13).  Given that the instant lawsuit was not filed until 2015, that reference does not clarify whether the other incident occurred before or after May 4, 2014 and whether the other lawsuit was filed before or after May 4, 2014.  If the incident and lawsuit occurred after May 4, 2014, that other incident can have provided no notice of a need to train before the May 4, 2014 incident made the basis of this lawsuit.  Dubose does not supply the other case number or name of the plaintiff or name of the officer(s) allegedly involved.

first part of that allegation simply stated that, over the past five years, the Chief was on notice about the severity of depriving patients of necessary medication.  However, general knowledge that depriving those in jail of seizure medicines has severe consequences is different than specific knowledge that Hueytown officers have indeed unlawfully engaged in such deprivation or that officers at the jail did not understand the importance of allowing people at the jail to take such medication. General knowledge would not notify the Chief of a need to train, supervise, and/or discipline.  Specific knowledge may or may not provide such notification, depending on the circumstances.  The Amended Complaint does not provide information regarding circumstances to show the Chief had knowledge of a need to train, supervise, and/or discipline.

The second part of the allegation does refer to *one* specific  instance when suit was filed against the City of Hueytown and the Chief sometime in the five years prior to Dubose's suit, alleging deprivation of seizure medication to one inmate other than Dubose.  Significantly, the allegation does not state that the prior deprivation of the seizure medication was unlawful. Further, it does not state whether the prior suit was successful, or other helpful contextual allegations of fact such as whether the Chief participated in the deprivation, whether the officer(s) involved in that prior incident received discipline, whether those officers were still employed by the City, and whether the circumstances of the prior medication deprivation made that action appropriate or whether the deprivation was intentional or simply inadvertent.  *See, e.g., Gold v. City of Miami,* 151 F.3d 1346, 1351 (11th Cir. 1998) (noting, in the context of municipal liability for failure to train, that past *complaints* of misconduct do not necessarily provide notice of a need to train without a demonstration of the *merit* of those complaints).

Even if this particular allegation in Count III of Dubose's Amended Complaint turns out to be true, the statement alleged would not establish notice of a need to train:  the reference to the

prior suit does not address the merits of that case or whether the suit was filed before or after the incident of May 4, 2014 involving Dubose.  So, the vague statement about a prior lawsuit based on one incident, even if true, does not mean that the Chief received notice of a need to train in those areas.

Further, an allegation pointing to *one* lawsuit, which may or may not be meritorious, does not ordinarily show the "widespread abuse ... that is obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences" sufficient to confer notice upon the supervisor. *See Wilson v. Attaway,* 757 F.2d 1227, 1242 (11th Cir. 1985) (a prior "single incident" involving the police chief pushing and threatening in an argument over directing traffic "was neither a 'history of abuse' nor so flagrant and outrageous that it leads to an inference of failure by the mayor to supervise"); *Hartley,* 193 F.3d at 1269 (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.").   Thus, the allegation as worded— the mere filing of *one* prior lawsuit based on *one* alleged incident of medication deprivation— does not allege a pattern or practice that put Chief Hagler on notice that he had a problem with his current officer(s) that required training, supervision, and/or discipline and that the natural result of failure to take such action would be the deprivation of constitutional rights, such as Dubose allegedly sustained.

Finally, the allegations do not state that Chief Hagler himself established a custom or policy in the area of medical treatment that called for depriving patients of necessary medication and that resulted in deliberate indifference to Dubose's constitutional rights.  In sum, the Amended Complaint does not allege a custom or pattern or practice or policy in existence prior to March 4, 2014 regarding the unconstitutional deprivation of necessary medication needed by

Hueytown jail inmates that would have provided actual or constructive notice to Chief Hagler of a need to train, discipline, and/or supervise officers about providing medicines to detainees.

However, the Supreme Court has recognized that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409 (1997) (discussing its decision of *City of Canton v. Harris,* 489 U.S. 378 (1989)). "The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city [or, presumably, its policy-makers] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson,* 563 U.S. 51, 63-64 (2011) (explaining the *Canton* decision).   The Court provided this hypothetical example of an area where such a failure to train would be patently obvious: "a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id.* (recounting the *Canton* decision).  However, courts have been reluctant to enlarge the narrow single-incident exception identified in *Canton.  See, e.g., Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003) (declining to extend the single-incident exception to *Brady*[4] violations).

The allegations in this case do not fit within, or even come close to, the confines of the single-incident hypothetical in *Canton,* and this court FINDS that the alleged fact situation here is not analogous.  Therefore, this court will not extend the "narrow" single-incident exception to medication deprivation and the allegations presented here.

---

[4] The term comes from the Supreme Court decision of *Brady v. Maryland,* 373 U.S. 83 (1963) in which the Court found that the prosecution's suppression of evidence favorable to and requested by the defendant violates due process when that evidence is material to guilt or punishment.

22

The court next examines the allegations against Chief Hagler in Count VII to see if they provide sufficient clarification to state a deliberate indifference claim.  Here, Dubose asserts that the City of Hueytown and Chief Hagler "have created an atmosphere of tolerance regarding willful, wanton, and improper behavior of its officers that has resulted in a reputation of indifference to the medical needs of citizens while being detained in Hueytown's Jail." (Doc. 24, at 18, ¶ 69).  He further asserts that they "are engaging in a pattern or practice of systemic deficiencies that has resulted in a widespread history of denial of basic medical treatment and providing of medications by Hueytown Police Officers" including

> a. failing to provide adequate emergency medical training to Hueytown Police Officers;
> b.  failing to train Hueytown Police Officers in the areas of arrest and medical treatment and services of inmates;
> c.  failing to adequately investigate incidences of denial of medical treatment and services of inmates;
> d.  failing to adequately discipline officers who engage in misconduct regarding deliberate disregard for the medical needs of citizens in their custody[.]

(Doc. 24, at 18-19, ¶ 70).

However, the court cannot find *facts* supporting these conclusory allegations.  Dubose refers generally to what he characterizes as an atmosphere of tolerance of improper behavior, but he provides no *facts* to support that alleged atmosphere.  He refers generally to a "pattern or practice of systemic deficiencies that has resulted in a widespread history of denial of basic medical treatment," but gives no examples of those deficiencies such as the type of medication involved,[5] the number of incidents, the time period of the incidents, or the officers involved.  The court is not suggesting that he needs to provide all of that information, but the dearth of any such

---

[5]  He does not specify, for example, whether the pattern of deficiencies involved prescription versus non-prescription medicine such as aspirin, in this count, although he referred to one other undated incident regarding seizure medication deprivation in Count III.

facts leaves the allegation bare.   Further, Dubose gives no facts about whether Chief Hagler participated in these incidents and whether he had notice of these incidents.   Given the lack of *facts*, the court has no way of determining from the allegations whether Chief Hagler would have notice of any prior incidents; whether those incidents would give rise to a need to train, supervise and/or discipline; or whether the existence of such incidents is mere speculation on Dubose's part, or he is simply pleading the bare elements of his cause of action.

Appearing to acknowledge the lack of facts to support his naked assertions, Dubose stated in his brief that he hoped to be able to learn supporting facts through the discovery process.  *See* Resp. Br. Doc. 27, at 16.  However, the rules of federal pleading do not allow plaintiffs to plead general and conclusory allegations without supporting facts.  The discovery process should not be a fishing expedition to learn if the speculative, conclusory allegations have any basis in fact. *See Iqbal,* 556 U.S. at 679-80 ("Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  Further, in cases when qualified immunity is invoked, that immunity is "an entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985), which means that the state actors should not have to participate in discovery unless it is needed to resolve the immunity issue or unless the plaintiff ultimately meets his burden of establishing that the immunity does not apply to those state actors.  Conclusory allegations, without more, are not well-pleaded facts; they fail to apprise Chief Hagler, and this court, of the factual basis of Dubose's claims, *see Franklin v. Curry,* 738 F.3d 1246, 1250 (11th Cir. 2013),  and they fail to "raise a right to relief above the speculative level."  *Twombly,* 550 U.S. at 555.

For all of these reasons, Dubose's Amended Complaint fails to allege sufficiently that Chief Hagler's own conduct violated federal constitutional or statutory law as to the deprivation

24

of Dubose of his seizure medication.  Accordingly, his allegations fail to establish part one of the qualified immunity test and fail to meet his burden to establish that the Chief is not immune; the court FINDS that Chief Hagler is entitled to qualified immunity as to the federal claims asserted against him in his *individual* capacity based on the failure to train, supervise, and/or discipline regarding medical treatment and medical procedure.

Accordingly, Chief Hagler is entitled to qualified immunity as to all the federal claims asserted against him, and the court will GRANT Chief Hagler's motion as to all such federal claims.  Because the last dismissal of such claims was "without prejudice" and Dubose has already had a second chance to plead, this dismissal will be WITH PREJUDICE.

(2).  State Law Claim against Chief Hagler: Tort of Outrage

The only remaining state law claim that Dubose asserted against Chief Hagler is the claim for tort of outrage in Count IV.   Although ¶ 56 in that count names Hagler in its introductory section as being guilty of outrageous conduct "as previously set out herein," the specific listing of allegedly outrageous conduct that ensues in subparagraphs 56 a.-f.  does not refer to any conduct by Chief Hagler himself.  Accordingly, the court must speculate about what conduct of Chief Hagler "previously set out herein" is allegedly outrageous conduct of which Dubose complains. Because Counts I and II similarly do not refer to Chief Hagler, the court must presume that Chief Hagler's allegedly outrageous conduct was his failure to train, supervise, and discipline other officers, as generally alleged in Count III.  As discussed earlier, Count III does not allege that Chief Hagler himself participated in or directed the specific actions or inaction allegedly committed against Dubose at the scene of the accident and at the jail.

In Alabama, to prevail on a claim for the tort of outrage, a plaintiff must prove that the defendant's conduct: "(1) was intentional and reckless; (2) was extreme and outrageous; and (3)

25

caused emotional distress so severe that no reasonable person could be expected to endure it."

*Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1043 (Ala. 1993).  The Supreme Court

of Alabama has explained that the tort of outrage is

> an extremely limited cause of action.   It is so limited that this Court has
> recognized it in regard to only three kinds of conduct: (1) wrongful conduct in
> the family-burial context.  *Whitt v. Hulsey,* 519 So. 2d 901 (Ala. 1987); (2)
> barbaric methods employed to coerce an insurance settlement, *National Sec.
> Fire & Cas. Co. v. Bowen,* 447 So. 2d 133 (Ala. 1983); and (3) egregious
> sexual harassment, *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322 (Ala. 1989).

*Potts v. Hayes,* 771 So. 2d 462, 465 (Ala. 2000).

> In *Little v. Robinson,* the Alabama Supreme Court qualified *Potts* by stating as follow:

> That is not to say, however, that the tort of outrage is viable in only the three
> circumstances noted in *Potts.*  Recently, this Court affirmed a judgment on a
> tort-of-outrage claim asserted against a family physician who, when asked by a
> teenage boy's mother to counsel the boy concerning his stress over his
> parents' divorce, instead began exchanging addictive prescription drugs for
> homosexual sex for a number of years, resulting in the boy's drug addiction.
> *See O'Rear v. B.H.,* 69 So. 3d 106 (Ala. 2011).  It is clear, however, that the
> tort of outrage is viable only when the conduct is "'so outrageous in character
> and so extreme in degree as to go beyond all possible bounds of decency, and
> to be regarded as atrocious and utterly intolerable in a civilized society.'"
> *Horne v. TGM Assocs., L.P.,* 56 So. 3d 615, 631 (Ala. 2010) (quoting Am. Rd.
> Svc. Co. v. *Inmon,* 394 So. 2d 361, 365 (Ala. 1980)).

*Little,* 72 So. 3d at 1172-73.

Keeping in mind the guidance of the Supreme Court of Alabama and the confines of the

tort it created, this court FINDS that the conduct alleged against Chief Hagler does not fall within

the extremely limited confines of the Alabama tort of outrage.  His asserted failure to train,

supervise, and discipline other officers, as generally alleged in Count III and incorporated by

reference in Count IV, is not conduct "so outrageous in character and so extreme in degree as to

go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable

in a civilized society."  To the extent that Dubose intended to assert that any other conduct of

Chief Hagler fits within the tort of outrage, he failed to sufficiently allege a plausible claim as to that conduct.  Thus, the court FINDS that the tort of outrage claim asserted against Chief Hagler in Count IV is due to be DISMISSED WITH PREJUDICE.

The court had previously dismissed the claims against Chief Hagler in his official capacity as well as the abandoned claims asserted against him in Counts III (under the Alabama Constitution and federal statutory laws) and  VII (under the laws of the United States and the Alabama Constitution).  Accordingly, no claims remain against Chief Hagler; the motion to dismiss is due to be GRANTED as to all claims asserted against him, and the court WILL DISMISS those claims WITH PREJUDICE, and DISMISS him as a party Defendant.

### b.  Officer Hickey and Corporal Campbell

The Amended Complaint states that "Defendants Campbell and Hickey were on the [accident] scene and participated in the arrest of Plaintiff Dubose" and are either Fictitious Officer A, B, C, or D; the conduct of each Fictitious Officer is described in detail in that pleading.  In the responsive brief, Dubose explains that, without further discovery, he is "unclear as to which fictitious Defendant's actions are attributed to" Defendant Hickey and Defendant Campbell.  (Resp. Br. Doc. 27, at 9 & 10).  Accordingly, the claims that are asserted or are potentially asserted against these two officers are Count I - Excessive Use of Force (against Fictitious Officer A); Count II - Fourth Amendment - Unlawful Search and Seizure (against Fictitious Officers A, B, C, & D); Count IV - Tort of Outrage (against Fictitious Officers A, B, C, & D, as well as naming Officers Campbell & Hickey); Count V - Assault and Battery (against Fictitious Officers A, B, C & D); Count VI - False Imprisonment (against Fictitious Officers A, B, C, and D); and Count VII - Deliberate Indifference to Medical Needs (against Fictitious Officers A, B, C, and D).

Defendants argue that the Amended Complaint fails to aver facts to state a plausible claim against any named individual Defendant, including Officers Campbell and Hickey, and is insufficient to apprise any named Defendant of what actions he is being called upon to defend. They insist that the identification of Officers Campbell and Hickey as *either* Fictitious Officers A, B, C or D (without limiting each Named Officer to one Fictitious Officer), and the attributing of specific conduct to those Fictitious Officers but not being able to yet attribute them to Campbell and Hickey, does not state a plausible claim against those Named Officers.

The court recognizes the challenges facing both Dubose and these Named Defendants. Dubose knows what happened to him and has provided detailed factual allegations in his Amended Complaint, allocating certain conduct to certain actors.  He knows the names of the officers at the accident scene from the police report, but does not know which names go with which actors.  He is not to blame at this point, prior to discovery, for not knowing the names of the specific actors.  As the court discussed in its last Memorandum Opinion, the Eleventh Circuit generally does not permit fictitious party practice, but has created a "limited exception ... when the plaintiff's description of the defendant is specific as to [make the use of the fictitious party's actual name to ] be 'at the very worst, surplusage.'"  *Richardson v. Johnson,* 598 F.3d 734, 738 (11th Cir. 2010) (quoting *Dean v. Barber,* 951 F.2d 1210, 1215-16 n. 6 (11th Cir. 1992)).  Based upon what information the court has before it at this point, the Fictitious Officer descriptions in the Amended Complaint appear to fall into that limited exception.

If the March 4, 2014 incidents at the accident site and the jail occurred as recounted, then each officer involved already knows which Fictitious Officer he is, and therefore, he is apprised of what claims are asserted against him in the Amended Complaint.  Naming each officer would indeed be surplusage.  The court notes that the Fictitious Officers, whatever their names, are

employees of the Defendant City as well as co-employees and fellow officers of the other Defendants; those parties—and not Dubose—are in the best position to identify the adequately described Fictitious Officers through police records, through Defendant Officers' recollections, and through the recollections of other personnel at the jail. *See Dean,* 951 F.2d at 1216 & n. 6.

Having recognized the challenges where conduct is attributed to Fictitious Defendants, the court also recognizes the unfairness that would result if Defendants' argument for dismissal of Defendants Campbell and Hickey prevailed. Anytime a public record, such as a police report, did not fully reveal the identities of the defendant officials, the city or county involved could stonewall any attempts to learn the name of the official, and then demand that he or she be dismissed when a plaintiff could not identify the official by name. In such cases, even if a plaintiff could provide specific facts about what occurred with a description of the unnamed officials, defendants would say—as they do here—that the plaintiff has not attributed specific facts to each named defendant sufficient to state a plausible claim. Such a result ignores the Eleventh Circuit's limited exception to the "no-fictitious-parties" rule, and this court rejects the argument.

Therefore, because the Defendants' argument for dismissal is based, in effect, on Dubose's inability at this pre-discovery stage to specifically identify which Fictitious Officer (A, B, C or D) is Officer Hickey and which is Corporal Campbell, the court rejects that argument. Defendants do not argue that the claims against Fictitious Officers A, B, C, or D fail to provide sufficient facts to withstand a 12(b)(6) challenge. Further, they present no specific challenges regarding the claims in each individual count.

This court is well aware that Officer Hickey and Corporal Campbell have raised their entitlement to qualified immunity. It is also well aware of its responsibility to resolve the

immunity issue "at the earliest possible stage in litigation," *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003), because that immunity is "an entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  However, this court cannot resolve the qualified immunity issue as to Officer Hickey and Corporal Campbell until Dubose is able to identify which Fictitious Officer each represents.  In the Order accompanying this Memorandum Opinion, the court will require the parties to proceed with discovery, and the first stage of discovery should be designed to identify the names that go Fictitious Officers A-D and resolve the mystery regarding which corresponds with Defendants Hickey and Campbell.  When Dubose makes that identification and substitutes the appropriate Named Defendants for the fictitious ones, the court will address each of those Defendants' entitlement to qualified immunity as to the federal claims, whether through a motion to dismiss or one for summary judgment.  Once the court determines the immunity issue, the court will proceed to address the state law claims, if appropriate.  Thus, acknowledging that the official capacity claims and abandoned claims are due to be granted, as discussed previously,  the court DENIES at this point the motion to dismiss as to all *other* claims asserted against Officer Hickey and Corporal Campbell.  However, the court does not foreclose re-visiting the denial after the Fictitious Defendants are identified.

### 2. The City of Hueytown

Dubose asserts claims against the City of Hueytown in Count III–Failure to Train, Supervise, and Discipline, and in Count VII–Deliberate Indifference to Medical Needs.

In Defendants' motion to dismiss, they argue that the Amended Complaint fails to "state a plausible § 1983 municipal liability claim against the City under the standard dictated by *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690-95 (1978)."   They insist that the

30

pleading "contains no tangible facts showing that any alleged policy or custom actually existed and was the result of the City's deliberate indifference, or that any claimed municipal policy or custom was the moving force causing any alleged constitutional deprivation." (Motion, doc. 25, at 6).

In his responsive brief, Dubose cites law stating that a failure to train represents "deliberate indifference when the need for more or different training is clear," but he does not explain why the need for more or different training would have been clear to City officials prior to March 4, 2014. (Resp. Br., doc. 2, at 15). He also cites law regarding supervisory liability, not municipal liability, and then appears to acknowledge that he does not yet have specific facts supporting a pattern and practice of officers' commission of the alleged constitutional violations: "After receiving discovery, Plaintiff will be in a position to prove and provide specific examples of Defendant City's pattern and practice of Defendant City Officers using excessive force, conducting unlawful searches and seizures, and depriving individuals of adequate medical care while in their care, custody, and control." *Id.* at 16.

As discussed in the section addressing claims against Chief Hagler, the Federal Rules of Civil Procedure and case law addressing those rules do not allow a plaintiff to survive a motion to dismiss by merely presenting speculative, conclusory allegations unsupported by facts, and to use the discovery process as a fishing expedition with the hope of supplying those facts. *See Iqbal,* 556 U.S. at 679-80.

In addition to Dubose's hopes of learning those facts in discovery, he appears to argue that the mere existence of the alleged deprivations by City officers that occurred on March 4, 2014 means that the City must have failed to train, discipline, and supervise, and must be guilty of deliberate indifference. As noted earlier, the Supreme Court of the United States has

31

instructed that "adequately trained officers occasionally make mistakes" and "the fact that they do says little about the training program ...." *City of Canton,* 489 U.S. at 391.  Therefore, mere allegations of constitutional deprivation by officers, standing alone, do not support a failure to train claim against the city employing them.   And mere allegations of constitutional deprivations committed by city employees, standing alone, do not support a claim against a city for deliberate indifference.  Such an argument is, in effect, calling for the imposition of *respondeat superior* liability, a theory of liability that the Supreme Court has repeatedly refused to impose under section 1983, not only for supervisory liability, as discussed previously, but also for municipal liability.

In *Bd. of Cnty Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997), the Supreme Court explained that it has "consistently refused to hold municipalities liable under a theory of *respondeat superior"*; "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  Instead, a well pleaded complaint against a city must allege that the city is liable because of its *own* illegal actions: "the governmental body itself" must deprive a plaintiff of his federal rights or cause him "'to be subjected to' such deprivation."  *Connick v. Thompson,* 563 U.S. 51, 60 (2011) (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 692 (1978)).  A plaintiff must allege that "'action pursuant to official municipal policy' caused their injury" and that official policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Id.* at 61 (quoting *Monell,* 436 U.S. at 692).

In 2011, the Supreme Court gave a further explanation about the "limited circumstances" in which a municipality "failure to train" can "rise to the level of an official government policy for purposes of § 1983" and meet the "stringent" deliberate indifference standard of fault:

> A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained] employees come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.
>
> Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes the city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

*Connick,* 563 U.S. at 61 (internal quotations and citations omitted). To demonstrate deliberate indifference, the Court has explained that "[a] pattern of similar constitutional violations" is "ordinarily necessary." *Id.*

As discussed previously, the Amended Complaint does not allege facts that would establish a pattern of similar constitutional violations. Further, it does not allege specific facts about past occurrences that would place city policymakers on actual or constructive notice that a particular omission in their training program, in their supervisory program, or in their disciplinary practices caused officers and/or employees to violate citizens' rights. The Amended Complaint does not provide facts to reflect that the alleged constitutional violations in these areas were caused by a custom or practice of the City. And, once again, Dubose's proposal that he be allowed to assert bare conclusory allegations against the City and then fill in the facts after discovery runs afoul of the pleading standards asserted in *Iqbal* and *Twombly.*

Finally, as discussed previously in this Memorandum Opinion, the court FINDS that the allegations in this case against the City do not fit within the confines of the single-incident hypothetical in *Canton,* and this court FINDS that the alleged fact situation here is not analogous.

33

This court will not extend the "narrow" single-incident exception to medication deprivation and the allegations presented here.  In sum, this court FINDS that the motion to dismiss is due to be GRANTED as to claims against the City in Counts III and VII for deliberate indifference and for failure to train, supervise, and discipline; those claims are due to be DISMISSED WITH PREJUDICE.

The court had previously dismissed as redundant all official capacity claims, given that the City itself is a party.  While Counts III and VII are the only ones that specifically name the City of Hueytown, the court notes that Dubose asserted claims against Fictitious Officers in Counts I, II, IV, V, and VI, and also asserted claims against Chief Hagler, Officer Hickey and Corporal Campbell in Count IV.  The style of the Amended Complaint stated that he was suing those Defendants in their individual *and official* capacities, but Dubose did not state in the text of those Counts that he was asserting those particular claims against the City or these individuals in their official capacities.  However, Dubose specifically stated that he was asserting the claims in Counts III and VII against the City, so his failure to so state in Counts I, II, IV, V, and VI reflects that he did not intend to assert the claims in those Counts against the City.  To the extent, if any, that Dubose attempted to assert claims against the City in Counts I, II, IV, V, and VI by asserting them against Fictitious Parties and/or Named Individual Defendants in their official capacities, the court FINDS that those claims fail to state a plausible claim for relief under Rule 12(b)(6) *against the City based on its own actions.*

For all of these reasons, the Defendants' motion to dismiss is due to be GRANTED as to all claims asserted against the City of Hueytown; those claims are due to be DISMISSED,  and the City is due to be DISMISSED as a party Defendant.  As this pleading is Dubose's second, that dismissal will be WITH PREJUDICE.

## VI.  CONCLUSION

In sum, the court FINDS that the following claims are due to be DISMISSED:

Official Capacity Claims:  the court WILL DISMISS WITH PREJUDICE all claims asserted

against Defendants—both named and fictitious—in their *official* capacities.

Abandoned Claims:  the court WILL DISMISS WITH PREJUDICE the following abandoned

claims:

- the claim in Count I for excessive force brought under federal *statutory* law *except* to the extent that the claim refers to § 1983 as a remedy to enforce alleged violations of federal Constitutional law;
- the claim in Count VII for deliberate indifference to medical needs for violation of any federal laws *except* those embodied in the United States Constitution;
- state law claims *except* for the following, which remain at this point:
  (1) the individual capacity claims asserted in Count IV for Tort of Outrage under Alabama law against Named Defendants Campbell and Hickey and Fictitious Officers A-J;
  (2) the individual capacity claims asserted in Count V for Assault and Battery under Alabama law against Fictitious Officers A-E; and
  (3) the individual capacity claims asserted in Count VI for False Imprisonment under Alabama law against Fictitious Officers A-J.

Claims against the City:  the court WILL DISMISS WITH PREJUDICE all claims asserted

against the City, and will dismiss the City as a party Defendant.

Claims against Chief Hagler: the court WILL DISMISS WITH PREJUDICE all claims asserted

against Chief Hagler, and will dismiss Chief Hagler as a party Defendant.

Count III:  As Count III only asserted claims against Chief Hagler and the City of Hueytown, the

court WILL DISMISS that Count from the Amended Complaint.

 Claims against Corporal Campbell and Officer Hickey:  as stated above, the court WILL

DISMISS WITH PREJUDICE all claims asserted against Defendants Campbell and Hickey in

their *official* capacities and all abandoned claims listed above that were asserted against them.

To the extent the motion requested those dismissals listed above, the court GRANTS the motion. The court recognizes that the motion was not brought on behalf of Fictitious Defendants except to the extent that they may represent Named Defendants Hickey and Campbell.  To the extent that those dismissal rulings involved claims asserted against Fictitious Defendants, the court WILL DISMISS them *sua sponte*.

The court WILL DENY the motion to dismiss as to all other claims not listed above, but, as previously discussed, the court does not foreclose re-visiting the denial as to the claims asserted against Defendants Campbell and Hickey after the fictitious Defendants are identified.

Remaining Claims:

• Individual capacity claims asserted in Count I for Excessive Use of Force against Fictitious Officers A and E based on alleged violations of the United States Constitution and brought pursuant to § 1983;
• Individual capacity claims asserted in Count II for Unlawful Search and Seizure against Fictitious Officers A, B, C, and D based on alleged violations of the Fourth Amendment to the United States Constitution and brought pursuant to § 1983;
• Individual capacity claims asserted in Count IV for the Tort of Outrage brought under Alabama law against Fictitious Officers A-J and Corporal Campbell and Officer Hickey;
• Individual capacity claims asserted in Count V for Assault and Battery brought under Alabama law against Fictitious Officers A-E;
• Individual capacity claims asserted in Count VI for False Imprisonment brought under Alabama law against Fictitious Officers A-J;
• Individual capacity claims asserted in Count VII for Deliberate Indifference to Medical Needs against Fictitious Defendants A-J based on alleged violations of the United States Constitution and brought pursuant to § 1983.

The court will enter a separate Order consistent with this Memorandum Opinion.

Dated this 15th day of July, 2016.

*Karon O. Bowdre*

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE